## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KEVIN DAWES<br>1509 Los Montes Drive<br>Burlingame, CA 94010<br><br>   Plaintiff,<br><br>v.<br><br>THE SYRIAN ARAB REPUBLIC<br>c/o Foreign Minister Faisal al-Mekdad<br>Ministry of Foreign Affairs<br>Next to al-Assad University Hospital<br>Next to Presidency of the Council of<br>Minister Building<br>Kafar Sousa, Damascus, Syria<br><br>   Defendant. | Civil Action No.: |

### COMPLAINT

Plaintiff Kevin Dawes ("Mr. Dawes") brings this action against Defendant the Syrian Arab Republic ("Syria") and alleges as follows:

### INTRODUCTION

1. Kevin Dawes is a U.S. citizen who was held captive by the Syrian Arab Republic ("Syria") from October 2012 until April 2016. During his detention, officials, employees, or agents of Syria, acting within the scope of their office, employment, or agency, tortured Mr. Dawes, causing him physical injury and emotional distress. Mr. Dawes brings this action under the Foreign Sovereign Immunities Act's "state sponsor of terrorism" exception to immunity, 28 U.S.C. § 1605A, and seeks compensatory damages for the assault and battery, intentional infliction of emotional distress, and false imprisonment caused by Syria's acts of torture. Mr. Dawes also seeks punitive damages.

**PARTIES**

2. Plaintiff Kevin Dawes is a 39-year-old U.S. citizen. He was born in Renton, Washington, and he currently resides in California.

3. The State Department designated the Syria Arab Republic a state sponsor of terrorism on December 29, 1979, and Syria has remained so designated since. *See* Revision of Foreign Policy Controls on Exports to Syria, Iraq, Libya, and the People's Democratic Republic of Yemen, 45 Fed. Reg. 33, 950, 33,956 (May 21, 1980) (codified 15 C.F.R. Part 385); *State Sponsors of Terrorism*, U.S. Dep't of State Bureau of Counterterrorism, https://www.state.gov/state-sponsors-of-terrorism/ (last visited Oct. 12, 2021); *Sotloff v. Syrian Arab Republic*, No. 16-725 (TJK), 2021 U.S. Dist. LEXIS 47625 at *19 (D.D.C. Mar. 15, 2021) ("The State Department designated Syria a state sponsor of terrorism on December 29, 1979, and Syria has remained so designated since."); *see also* Anti-terrorism: Syria, 15 C.F.R. § 742.9(a)(2) (2013) ("The Secretary of State has designated Syria as a country whose government as repeatedly provided support for acts of international terrorism.").

**JURIDICTION AND VENUE**

4. This Court has subject matter jurisdiction over Plaintiff's action and personal jurisdiction over Defendant the Syrian Arab Republic pursuant to 28 U.S.C. §§ 1330 and 1605A, which provide for jurisdiction over all civil actions for personal injury of a national of the United States caused by acts of torture carried out by state sponsors of terrorism and their officials, employees, and agents.

5. Mr. Dawes has afforded the Syrian Arab Republic a reasonable opportunity to arbitrate the claims in this action as required under 28 U.S.C. § 1605A(a). Mr. Dawes has made

an offer to arbitrate in accordance with accepted international rules of arbitration contemporaneous with this Complaint.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(f)(4).

## FACTUAL ALLEGATIONS

7. In late September 2012, Mr. Dawes flew from the United States to Turkey. Once there, he traveled to Harbiye, a Turkish city near the Syrian border. He then traveled by car to the Syrian border.

8. Mr. Dawes was traveling to Syria to work as a freelance photographer. He had previously covered the Arab Spring and sought to continue this work in Syria. Mr. Dawes also was seeking to transport medical supplies donated by a non-governmental organization to conflict-stricken areas in Syria.

9. About a day after Mr. Dawes entered Syria, on or about October 3, 2012, the car in which he was traveling with others was stopped at a security checkpoint. After questioning the driver, the men at the checkpoint pulled the occupants out of the car at gunpoint, then bound and hooded them. Before this, another man in the car jumped out of the vehicle and attempted to flee. Mr. Dawes saw one of the armed men repeatedly fire his weapon in the fleeing man's direction. Mr. Dawes was later told the fleeing man had been killed.

10. The armed men placed the bound and hooded Mr. Dawes in a barn with stalls, where he spent the night. The next day, his abductors moved him by vehicle, still handcuffed and hooded, to an L-shaped building that would be his prison for the next three and one-half years.

11. The prison is located in Damascus, Syria and operated by Syrian Military Intelligence. Syrian Military Intelligence is one of the four major branches of Syria's security forces and is treated as a political subdivision of Syria for purposes of the Foreign Sovereign

Immunities Act.  On July 28, 2021, the U.S. Department of Treasury's Office of Foreign Assets Control sanctioned eight Syrian prisons, including the one in which Mr. Dawes was held, run by Syria's intelligence apparatus, including Syrian Military Intelligence, which have been sites of human rights abuses against political prisoners and other detainees.  *See* Press Release, U.S. Dep't of Treas., *Treasury Sanctions Syrian Regime Prisons, Officials, and Syrian Armed Group* (July 28, 2021), https://home.treasury.gov/news/press-releases/jy0292.  Other non-governmental organizations, such as the Human Rights Watch, have cataloged the arbitrary arrests, torture, and enforced disappearances carried out by Syrian Military Intelligence in Damascus prisons, including the one in which Mr. Dawes was held.  *See* Human Rights Watch, *Torture Archipelago* (July 2, 2012), https://www.hrw.org/node/256334/printable/print.

12.     After Mr. Dawes arrived at the prison and his hood was finally removed, he observed portraits of Syrian leader Bashir Al-Assad on the walls and came to understand that his interrogators and captors were working on behalf of Syrian Military Intelligence and the Syrian government.  This understanding has since been confirmed by the Federal Bureau of Investigation ("FBI").  *See* Ex. 1 (Letter from Jill Roark, U.S. Dep't of Justice, FBI, Victim Services Coordinator (Sept. 23, 2021) (confirming Mr. Dawes' detention by the Syrian government).

13.     Once at the prison, Mr. Dawes was endlessly interrogated by Syrian Military Intelligence regarding his presence in Syria.  His interrogators attempted to coerce him into confessing to being affiliated with Syrian rebel groups, such as the Free Syrian Army, or to being affiliated with the U.S. Central Intelligence Agency.  They also pressured him to provide details regarding his supposed knowledge of Syrian government activities.  Over the course of the first week he was imprisoned, Mr. Dawes again and again attempted to convince his captors that he

was in Syria only as a journalist.  His interrogators responded to his appeals by making threats of bodily harm and death.

14. At no time was Mr. Dawes offered even a basic measure of due process.  Mr. Dawes was never charged with a crime under Syrian law, offered counsel, or afforded an opportunity to defend himself at a hearing or trial.  Indeed, the Syrian government did not even acknowledge it was holding Mr. Dawes until more than two years after he was imprisoned.  *See* Ex. 1.

15. Over the course of his imprisonment, Syrian Military Intelligence made good on its threats and repeatedly subjected Mr. Dawes to acts of physical torture, ostensibly to extract information from Mr. Dawes that he did not possess.  At the core of this barbaric treatment were regular yet unpredictable beatings—often with a wooden cane.  At first, these beatings were on and around Mr. Dawes' feet, and they occurred when his captors did not like the answers Mr. Dawes gave during the long, marathon interrogations.  These beatings to the feet resulted in deep and extensive flesh wounds that became infected and ultimately required a skin graft.  The skin graft was performed during Mr. Dawes' detention, but was botched, causing deformity and pain that continues to this day.  In addition to the beatings with the wooden cane, Mr. Dawes' captors beat every part of his body, including his arms and legs, with a rubber baton, and beat his head with an electrical cord.

16. Syrian Military Intelligence also regularly engaged in a particularly brutal form of torture. Mr. Dawes was handcuffed to brackets in a wall, which forced his arms to fully extend out from his sides—as though he was being prepared to be crucified.  His handcuffs were positioned high enough up on the wall so that Mr. Dawes' feet barely touched the floor.  With his arms pinned to the wall, he had to fight to stand on the tip of his toes.  If he tired and lowered his feet to the

floor, it became extremely difficult to breathe.  He was forced to remain in this position for hours at a time, over consecutive days.

17.     Mr. Dawes has permanent nerve damage as a result of the prolonged torture and abuse.  He no longer has any feeling on the top of his right foot from his ankle to his toes, and he has no feeling on the back of both thumbs.  At one point, Mr. Dawes lost his ability to speak.  He likely also suffered a concussion due to the beatings with a hard, electrical cord against his head.

18.     When Mr. Dawes was not being interrogated, he was held in solitary confinement in a tiny, dirty cell, approximately 3 feet by 6 feet in dimension.  He was rarely allowed outside of this cell—except for torture and interrogation—and was not permitted to go outside of the prison building at all.  His cell was underground and had no natural light, no heat, no bath fixtures, and no toilet.  Because of the lack of heat, Mr. Dawes suffered from the cold, and that suffering was heightened when the Syrian Military intelligence employees would arbitrarily and punitively remove Mr. Dawes' meagre bedding, leaving him both cold and unable to sleep.

19.     The lack of natural light in his cell prevented Mr. Dawes from knowing whether it was day or night.  Mr. Dawes' sense of time was further disoriented by his meal schedule, which was kept purposefully infrequent and inconsistent.  The meals also were inadequate, and Mr. Dawes suffered from hunger and malnourishment.  As a result, he weighed only 100 pounds when he was ultimately released, having lost 50 pounds, one-third of his body weight, in captivity.

20.     While he was wrongfully detained by Syrian Military Intelligence, Mr. Dawes was denied the basic necessities of personal hygiene.  For example, Mr. Dawes was not permitted to take a bath or shower for much of his detention.  He was not permitted to have a toothbrush for almost three years, and his teeth turned orange.  He was frequently infested with lice and covered with sores.  He was permitted to use a squat toilet just two times a day, even when he contracted

dysentery. The conditions in his cell were so poor that Mr. Dawes at one point became sick with what he now believes was tuberculosis. Indeed, he tested positive for tuberculosis when he was later released to the U.S. government.

21. Because of the torture and deplorable conditions he experienced, Mr. Dawes believed his death was inevitable. This caused intense mental anguish. He attempted to predict a schedule for when he would be beaten, but even that proved elusive, because the timing was irregular, leaving him in constant fear of hearing the key turn in the lock of his cell. Mr. Dawes could hear the cries of despair of other prisoners and witnessed a prisoner being tortured.

22. During his three and one-half years of detention, Mr. Dawes suffered extreme emotion distress and relentless anxiety, depression, and fear. The psychological trauma he suffered persists to this day, making assimilation back into American society difficult. Mr. Dawes has struggled to obtain long-term employment and has experienced homelessness since returning to the United States.

23. After Syria acknowledged to the outside world that it was holding Mr. Dawes, he began to receive visits from a Czech diplomat at the prison from January 2015 through March 2016. *See* Ex. 1. In particular, Mr. Dawes was visited by Eva Filipi, the Czech Ambassador to Damascus, because The Czech Republic maintains diplomatic relations with Syria.

24. On April 1, 2016, Mr. Dawes was finally released to the U.S. Government through the Russian Ministry of Foreign Affairs in Moscow. *See* Ex. 1. The Russian Foreign Ministry operated as an intermediary between the United States and Syria. Mr. Dawes was then transported by the FBI from Moscow to Stuttgart, Germany where he was debriefed by the FBI before traveling back to the United States.

# COUNT I

## (Personal Injuries Caused by Torture Under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c))

25. Mr. Dawes re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

26. Under 28 U.S.C. § 1605A(c), Mr. Dawes has a private, federal right of action against the Syrian Arab Republic for committing acts of torture against him. Section 1605A(c) requires four elements to be satisfied, all of which are met here:

   (a)   As of December 29, 1979, the Government of the Syrian Arab Republic, has been designated a state sponsor of terrorism by the U.S. Secretary of State. *See State Sponsors of Terrorism*, U.S. Dep't of State Bureau of Counterterrorism, https://www.state.gov/state-sponsors-of-terrorism/.

   (b)   Mr. Dawes was a U.S. citizen at the time of his imprisonment and torture and was therefore a national of the United States;

   (c)   The statute requires at 28 U.S.C. § 1605A(a)(2)(iii) that a claimant afford the foreign state a reasonable opportunity to arbitrate the claim if the actions giving rise to the lawsuit occurred in that foreign state. Simultaneously with the filing of the pleadings and the service of the Complaint, Mr. Dawes is providing Syria an Offer to Arbitrate the claim; and

   (d)   The foregoing allegations amount to "an act of torture . . . engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1).

27. The definition of "torture" under Section 1605A, which is derived from Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73, Section 3(b) (codified at 28 U.S.C. § 1350 (note)), includes:

> [A]ny act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having

> committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

28. Defendant Syria, acting through and in concert with its agent the Syrian Military Intelligence, intentionally subjected Mr. Dawes to three and a half years of severe pain and suffering, inhumane confinement, physical and mental abuse, and threats against his life, all with the intent of obtaining a false confession and extracting information about Mr. Dawes. These actions constitute torture as defined under the FSIA and TVPA.

29. Defendant Syria, acting through and in concert with its agent the Syrian Military Intelligence, caused Mr. Dawes to suffer extreme mental and physical anguish and pain.

30. Mr. Dawes continues to suffer physical and psychological harm to this day as a result of the treatment he received while in Defendant's custody.

## Theories of Recovery Under § 1605A

### *Assault and Battery*

31. Mr. Dawes re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

32. Defendant Syria, acting through and in concert with its agent the Syrian Military Intelligence, physically assaulted Mr. Dawes and took actions intended to make Mr. Dawes believe he would be physically harmed. Defendant also intended harmful or offensive contact with Mr. Dawes without his consent. Defendant's conduct included intentionally and repeatedly threatening Mr. Dawes's life, threatening bodily injury, and physically attacking Mr. Dawes.

33. As described in the foregoing allegations, the officials, agents and employees of Syria, including Syrian Military Intelligence, acting within the scope of their office, employment, or agency, caused Mr. Dawes to suffer extreme mental and physical anguish and pain.

34. Mr. Dawes continues to suffer physical and psychological harm to this day as a result of the treatment he received while in the custody of Syria.

35. Defendant Syria is therefore liable to Mr. Dawes for the full amount of his damages, in such sum as they may be hereinafter determined.

### *Intentional Infliction of Emotional Distress*

36. Mr. Dawes re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

37. Defendant Syria's imprisonment and torture of Mr. Dawes, as described in the foregoing allegations, violated acceptable norms of treatment under both U.S. and international law and was intentional and, reckless, extreme and outrageous. As fully described in the foregoing allegations, Syria threatened Mr. Dawes with bodily harm, physically abused him, and subjected him to inhumane living conditions and psychological trauma.

38. As described in the foregoing allegations, the officials, agents and employees of Syria, including Syrian Military Intelligence, acting within the scope of their office, employment, or agency, caused Mr. Dawes to suffer extreme mental and physical anguish and pain.

39. Mr. Dawes continues to suffer physical and psychological harm to this day as a result of the treatment he received while in the custody of Syria.

40. Defendant Syria is therefore liable to Mr. Dawes for the full amount of his damages, in such sum as they may be hereinafter determined.

### *False Imprisonment*

41. Mr. Dawes re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

42. Defendant Syria, acting through and in concert with its agent the Syrian Military Intelligence, deprived Mr. Dawes of liberty without cause and without legal justification.

Defendant held Mr. Dawes in detention even though there was no basis to do so. Mr. Dawes was notably never charged with a crime under Syrian law despite being held against his will for three and a half years.

43.     As described in the foregoing allegations, the officials, agents and employees of Syria, including Syrian Military Intelligence, acting within the scope of their office, employment, or agency, caused Mr. Dawes to suffer extreme mental and physical anguish and pain.

44.     Mr. Dawes continues to suffer physical and psychological harm to this day as a result of the treatment he received while in the custody of the Defendant Syria.

45.     Defendant Syria is therefore liable to Mr. Dawes for the full amount of his damages, in such sum as they may be hereinafter determined.

### *Punitive Damages*

46.     Defendant Syria's conduct was criminal in nature, deliberate, willful, wanton, malicious, and in violation of fundamental norms of international law protecting human rights and civilians in conflict.

47.     Under 28 U.S.C. § 1605A(c), an award of punitive damages should be imposed against Defendant Syria in an amount to be determined at trial.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.      Enter judgment against Defendant the Syrian Arab Republic in favor of Plaintiff for compensatory damages, including for economic damages, solatium, and pain and suffering.

B.      Enter judgment against Defendant the Syrian Arab Republic in favor of Plaintiff for punitive damages.

C.      Award reasonable attorney's fees and costs, including expert fees and interest.

D.      Provide any other further relief the Court deems just and proper.

Dated: October 15, 2021　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　　/s/ Kirby D. Behre
　　　　　　　　　　　　　　　　　　　　　　　　Kirby D. Behre (D.C. Bar # 398461)
　　　　　　　　　　　　　　　　　　　　　　　　Laura G. Ferguson (D.C. Bar #433648)
　　　　　　　　　　　　　　　　　　　　　　　　Miller & Chevalier Chartered
　　　　　　　　　　　　　　　　　　　　　　　　900 16th Street, NW
　　　　　　　　　　　　　　　　　　　　　　　　Washington, D.C. 20006
　　　　　　　　　　　　　　　　　　　　　　　　Tel:　(202) 626-5800
　　　　　　　　　　　　　　　　　　　　　　　　Fax:　(202) 626-5801
　　　　　　　　　　　　　　　　　　　　　　　　Email: kbehre@milchev.com
　　　　　　　　　　　　　　　　　　　　　　　　Email: lferguson@milchev.com