UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KEVIN DAWES,                         :
                                     :
        Plaintiff,                   :        Civil Action No.:    21-2730 (RC)
                                     :
    v.                               :        Re Document Nos.:    19, 20
                                     :
THE SYRIAN ARAB REPUBLIC,            :
                                     :
        Defendant.                   :

## MEMORANDUM OPINION

### GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

### I. INTRODUCTION

Plaintiff Kevin Dawes ("Plaintiff" or "Dawes") has spent 1,276 days of his life in captivity. From October 2012 until April 2016, Dawes was held in custody by Defendant, the Syrian Arab Republic ("Defendant" or "Syria"). Dawes alleges that, during his time in prison, agents working on behalf of the Syrian regime subjected Dawes to horrific physical and psychological abuse. Further alleging that Syria's actions amounted to torture, Dawes sued Syria under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.* Syria has not appeared to defend its conduct, and Dawes now moves for a default judgment on both liability and damages. *See* Pl.'s Mot. for Default J., ECF No. 19-2; Pl.'s Proposed Findings of Fact and Conclusion[s] of Law in Support of Mot. for Default J. ("Mot."), ECF No. 19-3. For the reasons that follow, his motion is granted.[1]

---

[1] Dawes recently filed a motion seeking to "expedite the Court's consideration of [his] Motion for Default Judgment." *See* Pl.'s Mot. to Expedite, ECF No. 21. Given that this memorandum opinion resolves Dawes's Motion for Default Judgment, the Court will deny Dawes's Motion to Expedite as moot.

## II. BACKGROUND

### A. Factual Background

In September 2012, Dawes traveled from the United States to Turkey with plans to continue to Syria. Mot., Ex. A, Decl. of Kevin Dawes ("Dawes Decl.") at ¶ 3, ECF No. 19-5. Although Dawes had trained as an electrical engineer, he was working at the time as a freelance photojournalist. *Id.* ¶¶ 2–3. He hoped to put his photojournalism skills to use in Syria. *Id.* ¶ 3.

Dawes arrived in Turkey in late September and, on or around October 2, crossed the border into Syria. *Id.* ¶¶ 4–5. The very next day, the car in which he was traveling "was stopped at a security checkpoint manned by armed militia." *Id.* ¶ 6. The militiamen "pull[ed] everyone out of the car at gunpoint," and proceeded to "b[ind] and hood" Dawes and the other men with whom he had been traveling. *Id.* Dawes's captors held him in a "barn stall overnight" and, the next day, transported him to a "new building" where they interrogated him as to why he was in Syria. *Id.* ¶¶ 7–8; *see also* Mot., Ex. B, Fed. Bureau of Investigation Letter ("FBI Letter") at 1, ECF No. 19-6 (confirming Dawes "was detained by the Syrian government on or about October 3, 2012"). As it would transpire, the "new building" to which Dawes had been transferred was a prison called "Branch 248," which was located in Damascus and operated by Syrian Military Intelligence. Dawes Decl. at ¶ 10; *see also* Mot., Ex. C., Human Rights Watch, *Torture Archipelago: Arbitrary Arrests, Torture, and Enforced Disappearances in Syria's Underground Prisons since March 2011* at 5, 42 (July 3, 2012), ECF No. 19-7.

Dawes ultimately spent over three and a half years in the prison. Dawes Decl. at ¶ 10. During that time, his captors confined him to a cell which he estimates to have been between no more than five feet wide and eight feet long. *Id.* ¶ 11. The cell lacked heat, a toilet, and natural light. *Id.* ¶ 13. Dawes's captors gave him "dirty and inadequate bedding" but frequently

removed these items "for punitive reasons," leaving Dawes no way to keep himself warm. *Id.* As a result, Dawes "often could not sleep because of the cold." *Id.* To make matters worse, Dawes shared his cell with "extreme numbers" of rats, cockroaches, and lice. *Id.* ¶ 14.

The conditions of Dawes's confinement were one of many factors that caused his health to deteriorate significantly over time. The lice, for example, caused Dawes to develop skin lesions (of which he still bears scars), and also caused his eyes to "swell shut due to [Dawes's] hyper-allergenicity [to] their feces." *Id.* Dawes's captors also denied him the ability to maintain even the most basic hygiene. They "almost never allowed [Dawes] to bathe or shower" and they prohibited him from having a toothbrush. *Id.* ¶ 15. As a consequence, Dawes's teeth "turned orange" and he developed "dental abscesses that were very painful." *Id.* Dawes did not receive any medical attention, and thus "live[d] with [the abscesses] until they drained on their own." *Id.*

At one point during his confinement, Dawes "contracted dysentery." *Id.* ¶ 16. Despite his illness, the guards "forced [him] to defecate in [his] cell," which did not contain a toilet. *Id.* His bout with dysentery left him "unable to eat" and he "eventually lost so much weigh that [his] clothes" no longer fit. *Id.* In addition to dysentery, Dawes also contracted tuberculosis during his time in prison. *Id.* ¶ 17.

Extremely unsanitary conditions and bouts with severe illness were not the only issues Dawes encountered. To the contrary, Dawes recounts that, after he had been imprisoned for several weeks, guards began subjecting him to "seem[ingly] . . . endless[]" sessions of torture. *Id.* ¶ 19. During some (but not all) of these sessions, guards interrogated him, accused him of "being a CIA agent," and attempted to "brainwash" him by dubbing him with "new names and then forcing [him] to use those names or face even more torture." *Id.* Dawes confronted a "choice" in these sessions: he could either "lie" by confirming his interrogators' accusations or

he could choose not to confess. *Id.* ¶ 20. If he chose the former, he might be "rewarded" with "food, water, and medical aid"; whereas if he chose the latter, he faced additional torture. *Id.*

Dawes also describes other forms of physical abuse. He states that his captors beat him with "wooden canes, . . . heavy electrical conduit wiring, a fan belt, and rubber batons." *Id.* ¶ 22. The guards also occasionally "chain[ed] [his] arms above [his] head in a doorway through a set of bars and us[ed] [him] as a human punching bag." *Id.* Separately, they subjected him to a "horrific and extremely painful" form of abuse referred to as "[d]ry drowning." *Id.* ¶ 23. This involved his "captors handcuff[ing] [him] to [brackets high on a] wall so that [his] arms were fully extended over [his] head." *Id.* In this position, his feet could "barely touch the floor" and he "had to fight to stand on the tips of [his] toes." *Id.* As he tired and "attempted to lower [his] feet to the floor for relief, [he] could not breathe." *Id.* His captors kept him chained in that "position for hours at a time, until [he] was on the verge of asphyxiation, and only then would a guard let [him] down from the wall." *Id.*

In addition, Dawes's jailors frequently placed him in "stress positions." *Id.* ¶ 24. For example, they tied him "to a metal gate with [his] hands and arms handcuffed above [his] shoulders and [his] feet flat on the ground for hours at a time," causing all of the blood to drain from his arms. *Id.* On one occasion, he remained in that position for five consecutive days and was "not permitted to sleep." *Id.* He was unable to "speak for almost six weeks" thereafter. *Id.*

Dawes describes a separate instance during which his "interrogators smashed [his] right foot with a heavy electrical conduit wire," causing his foot to swell and develop blisters. *Id.* ¶ 25. When the skin on his foot "turn[ed] black" and began to ooze "black pus," his "captors gave [him] antibiotics" but to no avail. *Id.* Eventually, his condition worsened to such an extent that his "captors had to transfer [him] to a hospital in Damascus." *Id.* He spent approximately a

month in the hospital, during which time he had three surgeries on his foot. *Id.* ████████

████████████████████████████████████████████████

████████████████████████

       In addition to the physical abuse Dawes suffered, he was also subjected to significant psychological abuse. Dawes reports that, from his cell, he "heard other prisoners [including women and children] begging and shrieking in pain and being tortured." *Id.* ¶ 12. He also was forced to watch as guards "tortured and abused" other prisoners. *Id.* ¶ 26. Dawes recalls two particularly horrific experiences: one in which he "saw the guards rape an adult male prisoner while he was chained to a wall," and another in which he watched as "a blindfolded child [was] restrained by a guard outside a room where prisoners were routinely tortured." *Id.*

       As time passed and Dawes remained in prison, he began to believe that his "death was inevitable" and that he would never "escape or be rescued." *Id.* ¶¶ 28–29. But, fortunately, relief did eventually arrive. In December 2014, Syria admitted that it was detaining Dawes. FBI Letter at 1. Following Syria's admission, Czech diplomats visited him in prison. Dawes Decl. at ¶ 33. Their visits continued through March 2016, and Syria finally released Dawes on April 1, 2016. FBI Letter at 1.

       Since his release, Dawes has endured additional difficulties stemming from his time in Syria. ████████████████████████████

████████████████████████████████████

██████████████████████████████

████████████████████████████████

██████████████████████████████

████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████

Dawes has also had difficulty finding employment since 2016. He briefly worked "as an intern for a company called Advantest," but because his engineering "skills had degraded during the years [he] was held in Syria" he was unable to continue in the role. Dawes Decl. at ¶ 39. Over the last six years, therefore, Dawes has mainly worked as a delivery driver for Uber Eats. *Id.* ¶ 40.

### B. Procedural Background

Dawes filed this suit against Syria on October 15, 2021. *See* Compl., ECF No. 1. Syria failed to answer, and, in August of 2022, Dawes requested—and was granted—an entry of default. *See* Pl.'s Mot. for Entry of Default, ECF No. 16; Clerk's Entry of Default, ECF No. 17. Dawes now moves for default judgment on both liability and damages. *See generally* Mot.

## III. LEGAL FRAMEWORK

### A. Default Judgment

Federal Rule of Civil Procedure 55 sets forth a two-step process for a party seeking default judgment: entry of default, followed by entry of default judgment. Fed. R. Civ. P. 55; *see also Int'l Painters & Allied Trades Indust. Pension Fund v. Rose City Glass Co.*, 729 F. Supp. 2d 336, 338 n.3 (D.D.C. 2010) (citing Fed. R. Civ. P. 55; *Eitel v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986); *Meehan v. Snow*, 652 F.2d 274, 276 (2d Cir. 1981)). First, after a defendant has failed to plead or otherwise defend against an action, the plaintiff may request that the clerk of the court enter default against that defendant. *See* Fed. R. Civ. P. 55(a). Second, following the clerk's entry of default, and where the plaintiff's claim is not for a sum certain, Rule 55(b)(2)

permits the plaintiff to apply to the court for entry of default judgment. Fed. R. Civ. P. 55(b)(2).
By providing for a two-step process, Rule 55 provides the defendant an opportunity to move the
court to set aside the default before the court enters default judgment. Fed. R. Civ. P. 55(b)–(c).

Although entry of default judgment may at times be appropriate, it is "not automatic."
*Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 74 (D.D.C. 2017) (quoting *Mwani v. Bin
Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted)). Because "strong policies favor the
resolution of disputes on their merits," the court "normally" must view the default judgment as
"available only when the adversary process has been halted because of an essentially
unresponsive party." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H. F.
Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970) (per
curiam)). Even if a defendant appears "essentially unresponsive," *id.*, the court still has an
"affirmative obligation" to ensure that it has subject matter jurisdiction over the suit, *see James
Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). The court must also
"satisfy itself that it has personal jurisdiction before entering judgment against an absent
defendant." *Mwani*, 417 F.3d at 6–7. "Although the plaintiff[] retain[s] 'the burden of proving
personal jurisdiction,'" "[i]n the absence of an evidentiary hearing," [the] plaintiff[] can "satisfy
that burden with a *prima facie* showing." *Braun*, 228 F. Supp. 3d at 74 (internal quotation marks
omitted) (quoting *Mwani*, 417 F.3d at 6–7). To make the required *prima facie* showing, a
plaintiff may rely on his "pleadings, bolstered by such affidavits and other written materials as
[he] can otherwise obtain." *Mwani*, 417 F.3d at 6–7.

### B. Evidentiary Showing Required by the FSIA

A court addressing a FSIA claim can enter default judgment against a foreign state only if
"the claimant[s] establish[] [their] right to relief by evidence satisfactory to the court." 28 U.S.C.

§ 1608(e); *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court . . . has an obligation to satisfy itself that plaintiffs have established a right to relief."). This statutory standard mirrors the default judgment standard of Federal Rule of Civil Procedure 55(d). *See Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 90 (D.D.C. 2019) (citing *Owens v. Republic of Sudan* ("*Owens II*"), 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated and remanded sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020); *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003)). The "FSIA leaves it to the court to determine precisely how much and what kinds of evidence . . . plaintiff[s] must provide, requiring only that it be 'satisfactory to the court.'" *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)). A court making a determination about the evidence required must bear in mind Congress's statutory purpose in enacting a private right of action in section 1605A of the FSIA: to "compensate[] the victims of terrorism [and thereby] punish foreign states who have committed or sponsored such acts and deter them from doing so in the future." *Id.* at 1048 (quoting *Price v. Socialist People's Libyan Arab Jamahiriya* ("*Price I*"), 294 F.3d 82, 88–89 (D.C. Cir. 2002)). In parsing the evidence that plaintiffs offer, "[c]ourts may rely on uncontroverted factual allegations that are supported by affidavits." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) (citing *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010)). "Uncontroverted factual allegations that are supported by admissible evidence are taken as true." *Braun*, 228 F. Supp. 3d at 74–75 (citing *Roth*, 78 F. Supp. 3d at 386; *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008)); *see also Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007) (citing *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 94–95 (D.D.C. 2006)).

## IV. ANALYSIS

Before considering liability or damages in this FSIA case, the Court must first confirm it has subject matter jurisdiction over the plaintiff's claims and personal jurisdiction over the defendant. *See Barry v. Islamic Republic of Iran* ("*Barry I*"), 410 F. Supp. 3d 161, 172 (D.D.C. 2019). For the reasons set forth below, the Court finds that it has subject matter jurisdiction over this suit pursuant to the FSIA, that it has personal jurisdiction over Defendant Syria, and that Dawes has established liability and is entitled to damages.

### A. Subject Matter Jurisdiction[2]

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in the United States." *Owens v. Republic of Sudan* ("*Owens I*"), 826 F. Supp. 2d 128, 148 (D.D.C. 2011). Although the FSIA generally grants foreign states complete immunity from suit, *see* 28 U.S.C. § 1604, it also establishes specific exceptions to that broad grant of immunity. *See Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015). If the defendant's conduct falls within one of the enumerated exceptions, federal district courts possess subject matter jurisdiction over claims arising from the defendant's acts. *See id.* at 14; *see also Owens I*, 826 F. Supp. 2d at 148. The plaintiff bears the "initial burden of production" to show that an exception applies. *Barry I*, 410 F. Supp. 3d at 173 (quoting *Owens II*, 864 F.3d at 784).

---

[2] 28 U.S.C. § 1330 confers federal district courts with "original jurisdiction" in FSIA cases. The statute provides that original jurisdiction exists "without regard to amount in controversy" in "any nonjury civil action against a foreign state" that "seeks relief in personam," and for which "the foreign state is not entitled to immunity." 28 U.S.C. § 1330(a). In this case, Dawes has not demanded a jury trial and seeks only monetary damages, *see generally* Compl., and Syria is plainly a foreign state. Thus, the Court will focus on the final element: whether Syria is "not entitled to immunity," such that the Court may exercise subject matter jurisdiction over Dawes's claim.

"[J]urisdiction attaches" if the plaintiff satisfies this burden and "the defendant fails to present any evidence in rebuttal." *Owens II*, 864 F.3d at 784.

Relevant here is the so-called "terrorism exception" to sovereign immunity, which is codified at 28 U.S.C. § 1605A. The terrorism exception provides that "[a] foreign state shall not be immune from the jurisdiction" of United States courts where (1) "money damages are sought" (2) "against a foreign state" for (3) "personal injury or death" that (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1); *see Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 153 (D.D.C. 2019).

Dawes's claims against Syria satisfy each of these conditions. First, Dawes seeks to recover money damages. *See* Compl. at 11. Second, Syria qualifies as a foreign state. Third, Dawes alleges personal injury, including severe physical, mental, and emotional harm. *See* Mot. at 17–20. Fourth, those injuries were caused by Syria through its agents at Branch 248. *See Barry I*, 410 F. Supp. 3d at 174 (explaining that "[c]ausation in a FSIA suit is established when the plaintiff shows proximate cause, or 'some reasonable connection' between the defendant's act and 'the damages which the plaintiff has suffered'" (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010))). And finally, as discussed in more detail immediately below, Syria's conduct and its treatment of Dawes meet the statutory definition of "torture."

The FSIA's definition of "torture" mirrors the definition established in section 3 of the Torture Victim Protection Act of 1991 ("TVPA"). 28 U.S.C. § 1605A(h)(7). The TVPA defines "torture" as

> any act, directed against an individual in the offender's custody or physical
> control, by which severe pain or suffering[,] . . . whether physical or mental, is

intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual[,] . . . intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

TVPA § 3(b), Pub. L. No. 102-256, 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350.  In most cases, the issue of whether the defendant's conduct constitutes torture will turn on two factors. *See Abedini v. Gov't of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 129 (D.D.C. 2019).  The first factor—the severity requirement—looks to "the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim." *Price I*, 294 F.3d at 93.  For conduct to rise to the level of "torture," the pain and suffering inflicted must have been sufficiently "severe." *Radmanesh v. Islamic Republic of Iran*, 6 F.4th 1338, 1342 (D.C. Cir. 2021).  The second factor—the purpose requirement—considers whether the "production of pain [and suffering was] purposive, and not merely haphazard." *Price I*, 294 F.3d at 93; *see also Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 137 (D.D.C. 2021) ("To establish torture, the plaintiffs must . . . show that the conduct was sufficiently severe and purposeful.").

Here, the pain and suffering that Syria inflicted upon Dawes easily satisfies the severity requirement.  For years, Syrian guards locked Dawes in a tiny, vermin-infested cell without heat or a toilet.  Dawes Decl. ¶¶ 13–14.  They regularly denied him medical care, food, water, and the ability to maintain basic hygiene. *Id.* ¶¶ 15–16, 18.  On top of this, they subjected him to systematic beatings and interrogation sessions. *Id.* ¶¶ 19–22.  And more than once, they forced him into incredibly painful positions that rendered him barely able to breathe, *id.* ¶ 23, or completely unable to sleep, *id.* ¶ 24.  These acts caused Dawes profound and lasting agony that, to some extent, still persists to this day. *See Price I*, 294 F.3d at 93 (explaining that "[t]he more intense, lasting, or heinous the agony, the more likely it is to be torture").  Syria's conduct reflects the type of "extreme, deliberate and unusually cruel practices" that other courts have

held to constitute torture. *Radmanesh*, 6 F.4th at 1343 (quoting *Price I*, 294 F.3d at 92); *see id.* (listing the following as examples of torture: "sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain" (quoting *Price I*, 294 F.3d at 92–93); *Abedini*, 422 F. Supp. 3d at 129 (holding that defendant tortured plaintiff by regularly beating him, placing him in "stress positions," and denying him medical treatment); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 68 (D.D.C. 2015) (finding that defendant tortured plaintiff by beating him and "keeping him in excruciatingly painful positions for hours at a time"); *Azadeh v. Gov't of Islamic Republic of Iran*, No. 16-CV-1467, 2018 WL 4232913, at *11–12 (D.D.C. Sept. 5, 2018) (finding that defendant tortured plaintiff by confining her in a small cell with an "insect-infested rug" and no toilet, denying her medical care, and subjecting her to endless interrogations). The severity requirement has therefore been satisfied.

As for the second factor, Syria's conduct was clearly "intentional and malicious," "not merely haphazard." *Price I*, 294 F.3d at 93. Syrian interrogators questioned Dawes ceaselessly about his presence in Syria. They accused him of working as a CIA operative and "running a spy network in Syria." Dawes Decl. ¶ 19. It is not entirely clear whether the interrogators believed their own accusations, but that fact is immaterial. Rather, it is sufficient that Dawes's captors interrogated him—and inflicted pain and suffering while doing so—in order to obtain information regarding his presence in Syria and to manipulate him into confessing that he was a spy. *See Radmanesh*, 6 F.4th at 1343 (explaining that the purpose requirement is satisfied if pain and suffering is inflicted "to obtain information or a confession"); *Abedini*, 422 F. Supp. 3d at 130 (finding purpose requirement satisfied where Iranian agents sought to get plaintiff to "falsely confess that he was a CIA spy"). This conclusion is reinforced by the fact that Syrian guards

also frequently inflicted pain and suffering on Dawes as a means of punishing him. *See Radmanesh*, 6 F.4th at 1342 (explaining purpose requirement is satisfied if pain and suffering is inflicted "to punish").

Because the pain and suffering that Syria inflicted upon Dawes was both sufficiently severe and purposive, the Court concludes that Syria's conduct constitutes "torture" under the FSIA. That being so, Dawes has carried his burden of demonstrating that the terrorism exception applies, and that Syria is therefore not immune from suit.

One more step remains, however, before the Court may conclusively determine that it has subject matter jurisdiction over Dawes's claims. That is because section 1605A grants federal courts power to "hear a claim" arising under that section only if three additional conditions are satisfied. *See* 28 U.S.C. § 1605A(a)(2). First, the foreign state must have been designated as a "state sponsor of terrorism at the time of the act," and must "remain[] so designated when the claim is filed." 28 U.S.C. § 1605A(a)(2)(A)(i)(I). Second, the "claimant or the victim" must have been a national of the United States, a member of the armed forces, or "otherwise an employee of the Government of the United States[] or . . . an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment" at the time of the act. *Id.* § 1605A(a)(2)(A)(ii). And third, "in a case in which the act occurred in the foreign state against which the claim has been brought," the claimant must have "afforded the foreign state a reasonable opportunity to arbitrate the claim." *Id.* § 1605A(a)(2)(A)(iii); *see also Mohammadi*, 782 F.3d at 14; *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-1214, 2019 WL 3037868, at *3 (D.D.C. July 11, 2019).

The Court finds that all three conditions are satisfied. First, Syria was designated as a state sponsor of terrorism in 1979, *see* Revision of Foreign Policy Controls on Exports to Syria,

Iraq, Libya, and the People's Democratic Republic of Yemen, 45 Fed. Reg. 33956 (May 21, 1980), and has remained so designated ever since, *see* U.S. Dep't of State, State Sponsors of Terrorism, https://www.state.gov/state-sponsors-of-terrorism/ (last visited October 2, 2023); *see also Sotloff*, 525 F. Supp. 3d at 134–35. Second, Dawes was a United States citizen for the entire time he was detained in Syria, *see* Dawes Decl. at ¶ 1, and "United States citizens are nationals for FSIA purposes," *Sotloff*, 525 F. Supp. 3d at 135. Finally, Dawes afforded Syria a reasonable opportunity to arbitrate the claim. The FSIA "does not require any particular form of offer to arbitrate, simply the extension of a 'reasonable opportunity.'" *Sotloff*, 525 F. Supp. 3d at 135 (quoting *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 45 (D.D.C. 2018)). On the same day he filed his Complaint, Dawes filed an offer "to submit the claims asserted in the above-captioned matter to arbitration in accordance with accepted international rules of arbitration." Offer to Arbitrate at ¶ 1, ECF No. 2. Dawes also ensured that a translated version of the offer was mailed to Syria along with copies of the complaint and summons. *See* Aff. Requesting Foreign Mailing at 1, ECF No. 4-1. Syria did not respond. As a result, this element is satisfied. *See Sotloff*, 525 F. Supp. 3d at 135.

Accordingly, all of section 1605A's subject matter jurisdictional requirements are met, and Syria's sovereign immunity is waived with respect to Dawes's claims.

### B. Personal Jurisdiction

An additional jurisdictional question facing this Court is whether Dawes has met the FSIA's separate procedural requirements regarding personal jurisdiction. "Personal jurisdiction exists over a non-immune sovereign so long as service of process has been made under section 1608" of the statute. *Estate of Heiser v. Islamic Republic of Iran* ("*Heiser I*"), 466 F. Supp. 2d 229, 255 (D.D.C. 2006) (citation omitted); 28 U.S.C. § 1330(b) ("[P]ersonal jurisdiction over a

foreign state shall exist as to every claim for relief over which the district courts have

jurisdiction . . . where service has been made under section 1608 of this title.").  Section 1608

provides four ways to effect service: (1) "special arrangement for service between the plaintiff

and the foreign state or political subdivision;" (2) "in accordance with an applicable international

convention on service of judicial documents;" (3) in cases where the first two methods do not

suffice to effect service, "by sending a copy of the summons and complaint and a notice of suit"

including translations "into the official language of the foreign state, by any form of mail

requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of

the ministry of foreign affairs of the foreign state concerned," or (4) if the third method also fails,

> by sending two copies of the summons and complaint and a notice of suit,
> together with a translation of each into the official language of the foreign state,
> by any form of mail requiring a signed receipt, to be addressed and dispatched by
> the clerk of the court to the Secretary of State in Washington, District of
> Columbia, to the attention of the Director of Special Consular Services—and the
> Secretary shall transmit one copy of the papers through diplomatic channels to the
> foreign state and shall send to the clerk of the court a certified copy of the
> diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).

Neither option one nor option two applies here.  Dawes does not have a "special

arrangement" with Syria, nor is there an "applicable international convention."  28 U.S.C.

§ 1608(a); *Sotloff*, 525 F. Supp. 3d at 141.  Dawes therefore attempted to effectuate service using

the third method.  *See* Aff. Requesting Foreign Mailing, ECF No. 4 (request by Dawes's counsel

that Clerk of Court mail a copy of the summons, complaint, and notice of suit by registered mail

to the Ministry of Foreign Affairs for the Syrian Arab Republic).  When service was not

successful with this method, Dawes resorted to the fourth method and requested that the Clerk

"dispatch service through diplomatic channels, as provided in § 1608(a)(4)."  Request for

Service of Process on Def. (Jan. 20, 2022) at 1, ECF No. 11-1.  Dawes included "two copies of

the summons, civil cover sheet, complaint and a notice of suit, together with two copies of each

translation [in Arabic]," and requested that the materials be sent "by the Clerk of the Court to the

Secretary of State in Washington, District of Columbia, to the attention of the Director of Special

Consular Services." *Id.* at 2.  The Clerk of the Court thereafter indicated that the papers were

transmitted to the State Department pursuant to 28 U.S.C. § 1608(a)(4), Certificate of Clerk (Jan.

25, 2022), ECF No. 13, and later provided notice that the documents were transmitted through

diplomatic channels as the statute requires, *see* Return of Service Affidavit, ECF No. 15 (stating

that the "documents were delivered to the Syrian Ministry of Foreign Affairs under cover of

diplomatic note No. 1239-1/2022, dated June 14, 2022 and delivered on June 23, 2022").  Thus,

Dawes has satisfied section 1608's service of process requirements, and the Court may exercise

personal jurisdiction over Syria.

### C.  Liability

With these jurisdictional issues settled, the Court may now address the question of

liability.  Dawes brings his claims for relief directly under section 1605A(c) of the FSIA.

Compl. at 8.  As relevant here, section 1605A(c) creates a private right of action through which

United States nationals may seek to hold foreign states liable for "personal injury . . . caused by

acts" of torture.  28 U.S.C. § 1605A(c); *see Abedini*, 422 F. Supp. 3d at 131.  But even though

section 1605A(c) creates a private right of action, a plaintiff still must "prove a theory of liability

which justifies holding the defendant[] culpable for the injuries that the plaintiff[] allege[s] to

have suffered." *Mueller v. Syrian Arab Republic*, No. 18-CV-01229, 2023 WL 1398434, at *14

(D.D.C. Jan. 31, 2023) (quoting *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 122

(D.D.C. 2012)); *see Barry I*, 410 F. Supp. 3d at 176 ("[A] FSIA plaintiff must further 'prove a

theory of liability[]' to establish a claim for relief that entitles [him] to damages." (quoting

16

*Valore*, 700 F. Supp. 2d at 73)).  Because section 1605A(c) does not itself set forth potential

theories of liability, FSIA plaintiffs "generally" turn to "the lens of civil tort liability" to

articulate the justification for their recovery.  *Rimkus*, 750 F. Supp. 2d at 176.  "Based on the

D.C. Circuit's guidance, district courts in this jurisdiction 'rely on well-established principles of

law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well

as those principles that have been adopted by the majority of state jurisdictions' to define the

elements and scope of these theories of recovery."  *Worley v. Islamic Republic of Iran*, 75 F.

Supp. 3d 311, 335 (D.D.C. 2014) (quoting *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d

44, 54 (D.D.C.2012)).

Here, Dawes moves for relief under three theories of liability: assault and battery,

intentional infliction of emotional distress, and false imprisonment.  Compl. at 9–11; *see* Mot. at

20–23.  The Court will address each theory in turn.

### 1. Assault and Battery

Dawes first contends that Syria is liable for assault and battery.  *See* Compl. ¶¶ 31–35;

Mot. at 21–22.  "An assault occurs when one person (a) 'acts intending to cause a harmful or

offensive contact with the person of the other . . . , or an imminent apprehension of such a

contact, and (b) the other is thereby put in such imminent apprehension.'"  *Stansell v. Republic of

Cuba*, 217 F. Supp. 3d 320, 343 (D.D.C. 2016) (quoting Restatement (Second) of Torts § 21).

Recurrent acts of torture conducted over a prolonged period of imprisonment, by their very

nature, "subject the victim to 'imminent apprehension of harmful or offensive contact' at all

times."  *Abedini*, 422 F. Supp. 3d at 132 (quoting *Sutherland v. Islamic Republic of Iran*, 151 F.

Supp. 2d 27, 48 (D.D.C. 2001)).  Put another way, individuals who, like Dawes, are tortured over

the course of a term of imprisonment "withst[and] a continuous . . . tortious assault" that infects

every moment of their captivity." *Sutherland*, 151 F. Supp. 2d at 48 (finding assault where plaintiff "lived for over six years in an environment where, at any moment, he might [be] harassed or beaten for virtually no reason at all"). Given the facts recounted above, Syria is plainly liable for assault.

As for battery, that tort "occurs when one person (1) 'acts intending to cause a harmful or offensive contact with the person of the other . . . or an imminent apprehension of such a contact, and (2) a harmful contact with the person of the other directly or indirectly results.'" *Stansell*, 217 F. Supp. 3d at 342 (quoting Restatement (Second) of Torts § 13). "Harmful conduct" includes "any physical impairment of the condition of another's body, or physical pain or illness." Restatement (Second) of Torts § 13. Here, there is no question that Syrian officials battered Dawes when, for example, they struck him with wooden canes and rubber batons, chained him to walls, or forced him to remain awake for five consecutive days. *See Abedini*, 422 F. Supp. 3d at 127, 133 (holding Iran liable for battery where Iranian agents "whipped," "shocked," and "beat[]" plaintiff); *Stansell*, 217 F. Supp. 3d at 342 ("[T]he acts of physical torture—e.g., chaining the hostages to one another and to trees, forcing them to breathe gasoline fumes, imposing unwanted medical treatment on them—were direct, intentional, harmful contacts."); *Sutherland*, 151 F. Supp. 2d at 48 (finding defendant liable for battery for "beating [plaintiff] with a rubber hose"). Thus, Dawes has demonstrated that Syria may be held liable based on a theory of battery.

### 2. Intentional Infliction of Emotional Distress

Dawes also asserts that Syria may be found liable based on a theory of intentional infliction of emotional distress ("IIED"). *See* Compl. ¶¶ 36–40; Mot. at 22–23. A defendant is liable for IIED "when he, 'by extreme and outrageous conduct[,] intentionally or recklessly

causes severe emotional distress to' the plaintiff." *Stansell*, 217 F. Supp. 3d at 343 (quoting Restatement (Second) of Torts § 46). Again, the Court has little difficulty concluding that Syria—through its agents—intentionally inflicted severe emotional distress upon Dawes. As described above, Branch 248 prison guards intentionally subjected Dawes to various forms of physical and psychological torture which, by definition, constitutes "'extreme and outrageous' conduct." *Abedini*, 422 F. Supp. 3d at 133 (quoting *Price I*, 294 F.3d at 91–92). Among other things, Dawes's captors confined him in squalid conditions, denied him access to basic hygiene and medical care, forced him to defecate in his cell when he was sick, and made him watch as other prisoners were tortured, abused, and raped. Dawes Decl. at ¶¶ 13–16, 26. ███████████ ████████████████████████████████████████████████ *See id.* ¶¶ 28, 37, 43–44. Syria is therefore liable to Dawes based on a theory of IIED. *See Stansell*, 217 F. Supp. 3d at 343 (holding that plaintiffs could recover under an IIED theory where they suffered severe mental anguish as a result of being "denied medical care," "kept in cages," and "prevented from performing basic bodily functions and needs"); *Abedini*, 422 F. Supp. 3d at 133, 139 (finding Iran liable for IIED where its actions caused plaintiff to suffer PTSD and clinical depression).

### 3. False Imprisonment

Finally, Dawes seeks to hold Syria liable under a theory of false imprisonment. *See* Compl. ¶¶ 41–45; Mot. at 22. Liability for false imprisonment arises when "one person '(a) acts intending to confine the other . . . within boundaries fixed by the actor, . . . (b) his act directly or indirectly results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it.'" *Stansell*, 217 F. Supp. 3d at 343 (quoting Restatement (Second) of Torts § 35). Additionally, the plaintiff must demonstrate the "unlawfulness of" his confinement. *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 912 (D.C. Cir. 2015)

(quoting *Edwards v. Okie Dokie, Inc.*, 473 F.Supp.2d 31, 44 (D.D.C. 2007)); *Wallace v. Kato*, 549 U.S. 384, 389 (2007) (explaining that "[t]he sort of unlawful detention remediable by the tort of false imprisonment is detention *without legal process*"). All of the elements of the tort are easily satisfied here. The evidence establishes that Syria held Dawes in custody for over three-and-a-half years, that it did so without affording Dawes any legal process whatsoever, and that Dawes was both aware of his imprisonment and greatly harmed by it. Accordingly, Syria is liable to Dawes, under principles of false imprisonment, for the pain and suffering he endured as a result of the conditions of his confinement.

### D. Damages

The final question facing this Court is the proper measure of damages to award. Dawes seeks to recover compensatory damages for (1) the pain and suffering he endured both during and after his release as well as (2) his economic loss. Dawes also seeks punitive damages.

#### 1. Compensatory Damages

The FSIA expressly allows plaintiffs to pursue damages for "pain and suffering" as well as those for "economic" loss. 28 U.S.C. § 1605A(c); *see Abedini*, 422 F. Supp. 3d at 136. To recover such damages, the plaintiff "must prove that the consequences of the [defendant's] acts were reasonably certain to occur, and he must prove the amount of damages by a reasonable estimate." *Abedini*, 422 F. Supp. 3d at 136 (internal alteration omitted) (quoting *Moradi*, 77 F. Supp. 3d at 69). For the reasons discussed above, it is readily apparent that Syria's actions were "reasonably certain" to injure Dawes. *See Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163 (D.D.C. 2017) ("Pain and suffering, past and future, are obviously a reasonably certain consequence of torture."). The Court will therefore focus on whether Dawes has adduced sufficient proof that the damages figures he seeks are "reasonable estimates" of the losses he

suffered.  In doing so, the Court bears in mind that "expert testimony and prior awards for comparable injury" are useful guides in determining a reasonable estimate of a plaintiff's losses. *Warmbier*, 356 F. Supp. 3d at 55.

### a. Pain and Suffering

Dawes has presented detailed, shocking evidence of the mental and physical suffering he endured in Syria.  He now seeks $40 million as recompense for that suffering—a sum that includes $20 million for the pain he suffered during his time in prison and an additional $20 million for the pain he bore (and continues to bear) following his release. *See* Mot. at 23–24.

*Pre-Release Pain and Suffering.*  It perhaps goes without saying that it is difficult to put a number on the intense harms that Dawes suffered while in Syrian custody.  But that difficulty is not unique to this case, and, over time, courts have developed a consistent approach—a per-diem formula that awards victims "$10,000 per day of captivity"—to compensate those victims for injuries sustained while they were imprisoned. *Abedini*, 422 F. Supp. 3d at 136–37 (collecting cases applying this formula).  Courts have applied this formula in numerous cases, and they have done so largely irrespective of the amount of time that a given plaintiff was detained. *See, e.g.*, *Moradi*, 77 F. Supp. 3d at 70 (awarding $1.68 million for 168 days of detention); *Price v. Socialist People's Libyan Arab Jamahiriya* ("*Price II*"), 384 F. Supp. 2d 120, 135–36 (D.D.C. 2005) (awarding $1.05 million for 105 days of captivity); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 156–57 (D.D.C. 2010) (awarding $5.03 million for 503 days of captivity); *Sutherland*, 151 F. Supp. 2d at 51 (awarding $23.54 million for 2,354 days of captivity); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 113 (D.D.C. 2000) (awarding $24.54 million for 2,454 days of captivity); *but see Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 231–32 (D.D.C. 2012) (awarding $5 million for 21 days of captivity).

Syria held Dawes captive for 1,276 days. Mot. at 25. Applying the $10,000-per-day rule of thumb entitles Dawes to $12,760,000 in damages for his pre-release pain and suffering.

Dawes contends, however, that $12.76 million is "inadequate." *Id.* at 26. He therefore urges the Court to depart from the "arbitrary" custom of awarding $10,000 per day, and instead award him "at least $20 million." *Id.* The problem is that Dawes does not introduce any evidence, provide any explanation, or cite any comparable cases to suggest that an additional $7 million would provide a more reasonable estimate of his pre-release injury. *See Hill*, 328 F.3d at 684 (explaining that it is the *plaintiff* who bears the burden of proving "the amount of [his] damages"). Instead, Dawes simply asserts that the "way in which he was tortured"—in addition to the "length and frequency with which he was tortured"—entitles him to more. Mot. at 26.

The Court disagrees. Although Syria tortured Dawes in unquestionably horrific ways, the same has been true in many other cases in which courts have adhered to the per-diem approach. *See, e.g.*, *Abedini*, 422 F. Supp. 3d at 127, 136 (awarding $10,000 per day of captivity where plaintiff was "repeatedly beat, shocked, and whipped"; "hung from the ceiling by handcuffs"; forced into a "drawer with no light, food, water, or space to move"; and "repeatedly denied medical treatment"); *Hekmati*, 278 F. Supp. 3d at 151 (awarding $10,000 per day of captivity where plaintiff was beaten with batons, struck with an electrical taser, whipped, and "handcuffed in stress positions for hours at a time"). The same may be said of the duration of Dawes's imprisonment—his 1,276-day term of captivity is comparable in length to other FSIA cases in which courts declined to depart from the usual praxis. *See, e.g.*, *Abedini*, 422 F. Supp. 3d at 136–37 (1,268 days of imprisonment); *Hekmati*, 278 F. Supp. 3d at 163–64 (1,602 days of imprisonment); *Stansell*, 217 F. Supp. 3d at 346 (1,967 days in captivity).

All that being so, the Court will award Dawes $12,760,000 in damages for his pre-release pain and suffering. This award is consistent with this district's approach to calculating such damages, *see Abedini*, 422 F. Supp. 3d at 136–37, as well as the overarching goal of ensuring that "individuals with similar injuries receive similar awards," *Hekmati*, 278 F. Supp. 3d at 163 (quoting *Moradi*, 77 F. Supp. 3d at 70).

   *Post-Release Pain and Suffering.* Dawes also seeks $20 million for his pain and suffering post-imprisonment. Unlike awards for pre-release pain and suffering, there is no simple formula for calculating post-release damages. Instead, courts look to "awards granted to similarly situated plaintiffs in FSIA lawsuits" as a general baseline for calculating such damages. *Abedini*, 422 F. Supp. 3d at 137; *see Hekmati*, 278 F. Supp. 3d at 163 ("The primary consideration in these cases is to ensure that 'individuals with similar injuries receive similar awards.'" (quoting *Moradi*, 77 F. Supp. 3d at 70)). In most cases, courts award lump-sum damages to compensate plaintiffs for post-release pain and suffering. *See, e.g., Moradi*, 77 F. Supp. 3d at 70 (awarding $5 million for post-release damages following 168-day imprisonment causing severe and long-lasting PTSD and Major Depressive Disorder); *Price II*, 384 F. Supp. 2d at 136 ($7 million post-release damages to plaintiff suffering years of ongoing physical disabilities); *Wyatt*, 908 F. Supp. 2d at 231–32 ($5 million lump-sum for 21-day imprisonment and post-release pain and suffering); *Massie v. Gov't of Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 77 (D.D.C. 2008) ($13.4 million lump-sum for post-release damages). Central to determining the amount of these sums are "the victim's age at the time of release (the length of time he will be experiencing pain and suffering) and the extent of the victim's long-term injuries (the level of pain and suffering)." *Hekmati*, 278 F. Supp. 3d at 164.

With this backdrop in mind, the Court turns back to the case at hand. Dawes was thirty-three years old at the time of his release, and his life expectance at that time was 45.1 years. *See United States Life Tables 2016*, 68 Nat'l Vital Stats. Reps., no. 4, at 12 (2019). ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

Based on these factors, Dawes's case is materially similar to that of the plaintiff in *Hekmati*. There, the plaintiff—who had been imprisoned for 1,602 days in an Iranian prison—endured deplorable conditions of confinement as well as abuse that was similar in kind and frequency to that suffered by Dawes. *See Hekmati*, 278 F. Supp. 3d at 150–54. At the time of his release, the plaintiff was thirty-two years old and had a life expectancy of over forty-five years. *Id.* at 164. After analyzing "awards in other detention cases" and determining that the plaintiff's post-release "injuries [we]re severe and likely to persist," the court determined that $10 million was appropriate compensation for the plaintiff's post-release pain and suffering. *Id.*

Dawes's post-release pain, suffering, and circumstances are also close in kind to those of the plaintiff in *Abedini*. In that case, the plaintiff was detained in an Iranian prison for 1,268 days, during which time he was tortured and forced to live in squalor. *See Abedini*, 422 F. Supp. 3d at 137. Upon his release, the plaintiff was thirty-five years old and had a life expectancy of approximately forty-three years. *Id.* After comparing the facts of that case to two other cases (including *Hekmati*) the court found that the plaintiff was entitled to $9.63 million in post-release

24

damages. *Id.* The court calculated this figure by prorating the $10 million award in *Hekmati* to account for Abedini's slightly shorter life expectancy. *See id.*

Given the similarities between this case, *Hekmati*, and *Abedini*, the Court will follow the lead of those prior decisions and use $10 million as a baseline for calculating Dawes's damages. However, in light of the fact that Dawes, like Hekmati, had a life expectancy slightly greater than forty-five years at the time of his release, the Court sees no need to prorate that sum. Accordingly, the Court will award Dawes $10 million for his post-release pain and suffering.

In total, the Court awards Dawes $22,760,000 in damages for his pre- and post-release pain and suffering.

### b. Economic Damages

Dawes also seeks damages to compensate him for the wages he could have earned but for his imprisonment and the injuries stemming therefrom. *See* Mot. at 29. He contends that those injuries have "permanently derailed" his career and left him unable to "work as an engineer." *Id.*

In FSIA cases, the general rule is that "lost earnings—past and future—are compensable economic damages." *Moradi*, 77 F. Supp. 3d at 71. Like damages for pain and suffering, "economic damages must be proven 'by a reasonable estimate.'" *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 181 (D.D.C. 2019) (quoting *Moradi*, 77 F. Supp. 3d at 71). The difference is that economic damages "are not hard to quantify." *Moradi*, 77 F. Supp. 3d at 71. Because of this, a plaintiff must adduce "competent evidence" demonstrating the magnitude of his economic loss. *Id.* Such evidence may include "persuasive expert analysis" that is "supported by sound factual bases" and reasonable assumptions. *Rezaian*, 422 F. Supp. 3d at 181; *see Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012) ("The report

of a forensic economist may provide a reasonable basis for determining the amount of economic damages.").

Dawes has produced both evidence and persuasive expert analysis showing that—had he not been imprisoned and tortured in Syria—it is likely that he would have pursued a long career in the field of electrical engineering. *See* Mot., Ex. I, Expert Report of Steve Shedlin ("Shedlin Report") at 4–5, ECF No. 19-13. More specifically, a vocational expert concluded that Dawes would have obtained work either as an electrical engineer or as an electrical engineering technician. *See id.* at 4 (explaining that Dawes had received both a bachelor's and master's degree in electrical engineering and detailing his prior work experience as an electrical engineer). The evidence also suggests that, had Dawes reentered the workforce in early 2013, he would likely have worked for 34.5 years. Mot., Ex. K, Expert Report of Frank McGuire ("McGuire Report") at 7, ECF No. 19-15. ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████ Shedlin Report at 5. Taking all of this into account, a forensic accountant calculated that Dawes's lost wages ranged from between approximately $1.8 million and $3.6 million when reduced to present value.[3] McGuire Report at 12.

---

[3] This range reflects a degree of uncertainty regarding precisely where, and in what capacity, Dawes would have worked had he returned to the United States in late 2012 or early 2013. Dawes states that, had he returned at that point in time, he likely would have either moved to San Raphael, California (where he lives currently) or "perhaps [to] an unspecified area in the East." Shedlin Report at 4. His vocational expert assumed that the most likely eastern destination would have been Ithaca, New York because that is where Dawes attended graduate school. *Id.* The forensic accountant's report takes both of these possibilities into consideration, and then calculates Dawes's lost wages had he worked as either an electrical engineer or an electrical engineering technician in one of those locations. In the end, the report calculates that,

After considering in detail the evidence and expert reports, the Court concludes that the most reasonable estimate of Dawes's lost wages is $2,241,047—the amount Dawes would have earned had he worked as an electrical engineering technician in San Raphael. *Id.* at 13. The Court finds it likely that Dawes would have worked in this capacity (rather than as an electrical engineer) given that Dawes had "minimal work experience" as an electrical engineer when he left for Syria. Shedlin Report at 4. Moreover, Dawes's skills would have "been a little bit dated" because he had been "out of the [electrical engineering] field" for a few years by that point. *Id.* ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████    *See* Dawes Decl. at ¶ 39. As for location, the Court finds it likely that Dawes would have moved to San Raphael rather than an "unspecified area in the East." *Id.*

Although $2,241,047 represents the amount of money that Dawes would have earned over the course of his career had he not been taken captive in Syria, that figure overstates the size of his economic loss. That is because, since his return, Dawes has demonstrated an ability to obtain work in other capacities. More specifically, he has worked as a delivery driver for Uber Eats—a job that earns him roughly $1,000 per month. Shedlin Report at 5. The forensic accountant calculated that, over time, the value of Dawes's accumulated earnings as a delivery driver would amount to $311,375. McGuire Report at 9. That being so, the Court will subtract $311,375 from $2,241,047 to calculate the value of Dawes's past and future lost earnings. Doing so shows that Dawes is entitled to $1,929,699 in economic damages, and the Court will award

---

had Dawes worked in San Raphael, he would have made $3,602,053 as an electrical engineer or $2,241,047 as an electrical engineering technician over the course of his career. McGuire Report at 13. Conversely, had he lived in Ithaca, he would have made $2,898,608 as an electrical engineer or $1,825,605 as an electrical engineering technician over the same period. *Id.*

that amount. Coupled with the damages for pain and suffering, this results in a total compensatory award of $24,689,699.

### 2. Punitive Damages

Finally, Dawes seeks punitive damages in the amount of $87.2 million—a figure that is twice the amount of his desired compensatory award. "Punitive damages, made available under the revised FSIA terrorism exception, serve to punish and deter the actions for which they are awarded." *Oveissi*, 879 F. Supp. 2d at 55–56. The purpose of such damages is not to "compensate the victim," but rather to "punish outrageous behavior and deter such outrageous conduct in the future." *Id.* at 56.

Courts analyze four factors to determine whether punitive damages are warranted in an FSIA case: "the character of the defendant's act; the nature and extent of harm to the plaintiff that the defendant caused or intended to cause; the need for deterrence; and the wealth of the defendant." *Abedini*, 422 F. Supp. 3d at 141 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp 1, 32 (D.D.C. 1998)). All four factors support a punitive damages award here. For one, the character of Syria's acts is reprehensible and deserving of the most severe condemnation. *See id.* (describing acts of torture as "the quintessential embodiment of outrageousness" (quoting *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 38 (D.D.C. 2001))). ██████████████

████████████████████████████████████████████████

██████████████ *See Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 291 (D.D.C. 2015) (awarding punitive damages where North Korea "caused irreparable emotional and psychological harm"). The imprisonment and torture by Syria of American citizens warrants significant deterrence. *See Abedini*, 422 F. Supp. 3d at 141 (finding that "Iran's conduct of imprisoning and torturing Iranian-American citizens" clearly merits deterrence);

*Rezaian*, 422 F. Supp. 3d at 183 ("Holding a man hostage and torturing him . . . is outrageous, deserving of punishment, and surely in need of deterrence."). And finally, "Syria is a sovereign that has substantial wealth." *Colvin*, 363 F. Supp. 3d at 163.

Determining the proper measure of punitive damages, however, presents a more difficult question. Over the last two decades, courts have devised at least four different methods of calculating punitive damages in FSIA cases. *See Christie v. Islamic Republic of Iran*, No. CV 19-1289, 2020 WL 3606273, at *21–22 & n.17 (D.D.C. July 2, 2020) (describing the various methods in detail). One approach—the so-called *Flatow* method—calculates punitive damages by "multiplying the defendant state's annual expenditures on terrorism . . . by a factor usually ranging from three to five." *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 122 (D.D.C. 2015). But a number of courts have recently rejected this approach, *see Christie*, 2020 WL 3606273, at *21 (collecting cases), and Dawes does not advocate its use here. A second approach is to award plaintiffs a fixed sum of money, often totaling hundreds of millions of dollars. *See, e.g.*, *Colvin*, 363 F. Supp. 3d at 164–65 (awarding a flat sum of $300 million). Dawes does not urge the Court to take that approach, nor does he seek a punitive award worth hundreds of millions of dollars.

That leaves two other possible methods, both of which calculate punitive damages by reference to compensatory damages. One approach pegs punitive damages to compensatory damages by multiplying the latter amount by a "court-determined multiplier," *Abedini*, 422 F. Supp. 3d at 141, that often falls "between one and five," *Christie*, 2020 WL 3606273, at *22 (quoting *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 65 (D.D.C. 2018)); *see, e.g.*, *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1, 10–11 (D.D.C. 2019) (applying this method). Courts set the multiplier based "on various factors, including, among other things,

whether the case involved exceptional circumstances, the perceived deterrence effect, the nexus between the defendant and the injurious acts, and the evidence plaintiffs presented regarding the defendant's funding for terrorist activities." *Hamen*, 407 F. Supp. 3d at 10.

The other approach is more straightforward: it entails awarding punitive damages in an amount equal to compensatory damages. *Christie*, 2020 WL 3606273, at \*22. The Court believes that this approach represents the preferrable course here. For one thing, a number of other courts in this district have applied this approach in cases closely resembling this one. *See, e.g., Abedini*, 422 F. Supp. 3d at 142 (awarding equal punitive and compensatory damages where plaintiff was "falsely imprisoned and tortured in Iranian prison"); *Hekmati*, 278 F. Supp. 3d at 167 (same); *Moradi*, 77 F. Supp. 3d at 73 (same); *Khosravi v. Gov't of Islamic Republic of Iran*, No. 16-CV-02066, 2020 WL 4923495, at \*7 (D.D.C. Aug. 21, 2020) (same). For another, Dawes has not attempted to explain (1) why the Court should instead use the multiplier approach or (2) why a multiplier of two is appropriate in the specific circumstances of this case. *See* Mot. at 29–30 (seeking "double the amount of compensatory damages" but providing scant justification or argument in support). The lack of developed argument on this point is glaring, especially in light of the fact that many cases involving multipliers of two (or higher) often involve conduct that is even more egregious than false imprisonment and torture. *Compare, e.g., Moradi*, 77 F. Supp. 3d at 73 (awarding equal compensatory and punitive damages where Iranian authorities directly detained and tortured, but did not kill, plaintiff), *with Fritz*, 324 F. Supp. 3d at 65 (applying multiplier of two in a case involving hostage-taking *and* killing by terrorist organization the defendant supported). Although there is no question that Syria's treatment of Dawes was reprehensible and deserves to be condemned and deterred, Dawes simply has not

shown that his case involves the type of exceptional circumstances that would warrant an award of punitive damages that are double the amount of his compensatory award.

As discussed above, Dawes will receive compensatory damages totaling $24,689,699, and the Court will award the same amount of punitive damages.  In total, therefore, the Court awards Dawes $49,379,398 in damages.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Default Judgment (ECF Nos. 19, 20) is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  October 31, 2023

RUDOLPH CONTRERAS
United States District Judge